UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| JOSEPH C. NILLES, | : | Case No. 1:10-cv-919 |
| --- | --- | --- |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| GIVAUDAN FLAVORS CORP., | : | |
| Defendant. | : | |

**ORDER THAT: (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 14) IS GRANTED; AND (2) THIS CASE IS CLOSED**

This civil action is before the Court on Defendant's motion for summary judgment (Doc. 14) and the parties' responsive memoranda (Docs. 23, 24).[1]

## I. BACKGROUND FACTS

Plaintiff filed this civil action against his former employer, Givaudan Flavors, Inc. ("Givaudan"), alleging claims for: (1) disability discrimination - ADA (Count I); (2) disability discrimination - Ohio Rev. Code § 4112.02(A) (Count II); (3) gender discrimination - Title VII (Count III); (4) gender discrimination - Ohio Rev. Code § 4112.02(A) (Count IV); and (5) FMLA Retaliation and Interference (Count V).[2] Defendant moves for summary judgment on all claims.

---

[1] Both parties seek oral argument on this motion. (Docs. 14, 23). Local Rule 7.1(b)(2) provides for oral argument where it "is deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." Here, the Court finds that the pleadings are clear on their face, and that oral argument is not necessary. *See Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (C. J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

[2] Plaintiff does not dispute dismissal of his claim for FMLA interference.

## II. UNDISPUTED FACTS[3]

1. In 2003, Givaudan hired Nilles as a purchasing supervisor. Nilles had no previous experience in the food or flavor industries. (Doc. 16 at 14-15).

2. Jack Dabney began working in Givaudan's flavor division in mid-2007 as its Regional Purchasing Coordinator, North America. (Doc. 14, Ex. 2 at ¶ 1).

3. In November 2007, Nilles, then purchasing manager for Givaudan's Carthage, Ohio and Devon, Kentucky facilities, informed Givaudan that he had a job offer from the Cargill Company. (*Id.*)

4. Nilles used that job offer from Cargill to negotiate more favorable terms of employment. Givaudan's purchase group was short-handed at the time. Givaudan agreed to grant Nilles an 8% pay increase. It also agreed, at Nilles's request, to obtain help for him in purchasing at the Devon facility. At that time, Nilles was responsible for purchasing for both the Devon and Carthage facilities. (*Id.*)

5. Givaudan interviewed Nancy Fulmer for the purchasing position at Devon. She had extensive experience in purchasing and warehousing in the flavor and food industries. Nilles and Dabney both interviewed her. (*Id.* at ¶ 2).[4]

6. Nilles recommended Fulmer's hire. (Doc. 16 at 26).

7. Givaudan hired Fulmer. Initially she reported to Nilles for a few months, but then directly to Dabney. Her position was the same as Nilles, but at the Devon facility. Nilles was purchasing manager for Carthage, and Fulmer was purchasing manager for Devon. (Doc. 14, Ex. 2 at ¶ 2).

8. Throughout 2008, Joe Nilles had performance problems. His communication and interpersonal skills were lacking, especially in his day-to-day dealings with purchasing personnel. Nilles communicated most of the time by e-mail when the situations required him to meet or call people in the organization to resolve issues. Nilles had problems being a self-starter for assigned project activities, instead requiring step-by-step instructions on

---

[3] *See* Doc. 14, Ex. 1 and Doc. 23, Ex. 1.

[4] Plaintiff denies this statement to the extent of Defendant's suggested inference that Fulmer's experience in the flavor industry motivated the decision to terminate Plaintiff and retain Fulmer. (*See, e.g.*, Doc. 17, Ex. 4 at 171-72; Doc. 18, Ex. A; Doc. 16 at 44-46).

how to proceed. Nilles's project management abilities did not meet Dabney's expectations. (*Id*.)[5]

9. Nilles admits Dabney talked to him about these problems throughout 2008 (Doc. 16 at 57, 63-65), and they are documented in various e-mail communications (*Id*.)[6]

10. In early September 2008, one of Nilles's subordinates, Kay Whitener, left the organization. The primary reason for her departing was a "very difficult manager/subordinate relationship with Joe Nilles." She stated that, "I do not want the record to show that money was the driving force in my decision. The main driving force is Joe Nilles." She went on to state, "I would like to make it clear that Joe Nilles is a very nice man. As a manager he is horrible." Deb Pickering of Givaudan human resources forwarded the exit interview to Dabney with a note, "I do suggest a plan of action with regard to Joe before other people exit the company, or the perception of your department suffers more." (*Id*. at ¶ 4).[7]

11. Following that, Pickering and Dabney discussed a plan to terminate Nilles based on poor performance. However, that plan was conditioned on a couple of things occurring. First, Givaudan needed to figure out who would manage purchasing in both Carthage and Devon. Second, it needed to fill the current site buyer vacancy held by Kay Whitener. The latter task took until May 2009. (*Id*. at ¶ 5).[8]

12. In the meantime, in February of 2009, Dabney met with Nilles and conducted his annual evaluation. In Dabney's summary, he went over all the performance issues noted above, issues that Nilles and Dabney had discussed throughout the year. (Doc. 16 at 63-65; Doc. 14, Ex. 2 at ¶ 6).

---

[5] Plaintiff denies this statement insofar as he never received any discipline in 2008, received a merit based bonus for 2008, and Fulmer never had occasion to complain about Plaintiff's supervision or interpersonal skills. (Doc. 16 at 44-46, 66, 66-68; Doc. 17 at 24; Doc. 27 at 23-24, 35, 37).

[6] Plaintiff maintains that Dabney's "conversations" with him were not formal discipline. (Doc. 26 at 66-68).

[7] Plaintiff denies the statement insofar as he was never disciplined for his management of Whitener and he cooperated with Spencer in discussing Whitener's complaint about her 2006 review. (Doc. 26 at 78-80, 122, 128, 129-30, 131, 132; Doc. 17 at 101, 103, 104-05).

[8] Plaintiff denies this statement insofar as Defendant offers no explanation regarding why it had to wait for Whitener's replacement and could not assign both plants to Fulmer in 2008 when it could do so in 2009. (Doc. 14 at 3).

13. Nilles feels that Dabney was a good boss. (Doc. 16 at 57).

14. In July of 2009, Scott Umphlett, another subordinate of Nilles, resigned. In his exit interview, he said, "I started looking because of Joe (Nilles)." He said that, "I know I'm not the first person to have issues with Joe's management style. I gave him the benefit of the doubt and I thought I'd see for myself. Everything that I heard about him has come true." (Doc. 14, Ex. 2 at ¶ 7).[9]

15. Dabney had come to conclude that the Company could reduce costs and increase efficiency if the same person managed purchasing for both Devon and Carthage, as Nilles had done before Givaudan hired Nancy Fulmer. Based on the conclusions Dabney had reached the year before and Nilles continuing performance problems, Dabney believed that Nilles should be let go and Fulmer should manage purchasing for both facilities. (*Id.* at ¶ 8).

16. Fulmer had consistently performed well. (*Id.*)[10]

17. By that time, Deb Pickering had left Givaudan. Willie Spencer was in the HR role that covered this decision. Spencer and Dabney discussed Dabney's decision to consolidate the positions. Dabney sent Spencer an e-mail about the previous plan to terminate Joe based on performance, which Spencer was not involved in. Spencer recommended that Dabney compare Fulmer and Nilles to make sure that he was picking the right person for the position. (Doc. 14, Ex. 2 at ¶ 9; Ex. 3 at ¶ 2). Spencer provided Dabney with an HR form to compare the two candidates for the RIF. (Doc. 17 at 112-13).[11]

---

[9] Plaintiff denies that Umphlett's comments motivated the termination decision as Dabney articulated several different scenarios regarding the decision to terminate Plaintiff, including that he made the decision to terminate Plaintiff before Umphlett's resignation because of Plaintiff's 2008 performance and, in contradiction to that reason, that he terminated Plaintiff as part of the RIF. (Doc. 14, Ex. 2 at ¶¶ 4, 5; Doc. 26 at 78-80).

[10] Plaintiff admits that Dabney testified that Fulmer performed well but notes that the only evidence Defendant offers for this statement is untested affidavit testimony and the "comparative analysis" Dabney performed before terminating Plaintiff was almost completely subjective. (Doc. 26 at 100, 143-44; Ex. 4 at 342).

[11] Plaintiff admits that Dabney and Spencer discussed the decision to terminate him, but denies the authenticity of the plan included in the email. (Doc. 17, Ex. 4 at 716-717).

18. Spencer did not have any input into the substance of Dabney's decision, but only described the process. (Doc. 14, Ex. 2 at ¶ 9; Ex. 3 at ¶ 2).[12]

19. Dabney formally evaluated Nancy Fulmer versus Joe Nilles. This confirmed Dabney's conclusions, and Dabney recommended to his boss that Givaudan terminate Nilles. Dabney's boss approved the termination based on his recommendation. (Doc. 14, Ex. 2 at ¶ 10).[13]

20. Nilles respected Fulmer and thought well of her abilities as a purchasing manager. (Doc. 16 at 93).

21. Fulmer has since successfully handled purchasing for both facilities. (Doc. 14, Ex. 2 at ¶ 10).

22. Dabney, the sole-decision maker, knew nothing and no one told him about any disability that Nilles might have had when Dabney made the decision to terminate Nilles. (*Id.* at ¶ 11).[14]

23. In a closed door meeting in April 2009, Nilles told Spencer that he had multiple sclerosis. (Doc. 16 at 53-54). Spencer told no one. (Doc. 17 at 52; Doc. 16 at 90).

24. Nilles's symptoms were invisible, and he needed no accommodation. (Doc. 16 at 44, 58).

25. Spencer – the only person at Givaudan with any knowledge of Nilles's disability – played no role in the decision to terminate Nilles's employment (Doc. 14, Ex. 2 at ¶ 9; Doc. 17 at 52, 108-09, 113; Doc. 14, Ex. 3 at ¶ 2).[15]

---

[12] Plaintiff admits that Spencer did not participate in the decision, but denies the inference that Dabney did not know about Plaintiff's disability.

[13] Plaintiff admits that Dabney recommended Plaintiff's termination, but denies that Dabney's "formal evaluation" was anything more than pretext for termination. (Doc. 26 at 100, 143-44; Ex. 4 at 432).

[14] Plaintiff denies this statement insofar as he took short term disability leave in April 2009 and told Dabney about his multiple doctor appointments. (Doc. 16 at 94; Ex. 3 at JN299; Ex. 1 at JN2085; Doc. 17 at Ex. 3).

[15] Plaintiff denies this statement insofar as he told Dabney about his multiple doctor appointments. (Doc. 16 at 94; Ex. 1 at JN2085; Ex. 3 at JN299; Doc. 17, Ex. 3).

26. In January 2008, Nilles requested leave for a respiratory infection. In March and April of 2009, Nilles requested leave for dizziness and headaches. Both times, Givaudan granted Nilles FMLA leave, and provided him with short-term disability benefits during his absences. (Doc. 16 at 94, 100, 102; Ex 7; Doc. 14, Ex. 3 at ¶ 3).[16]

27. Nilles admits he was given a letter on behalf of Givaudan expressly stating that his leave had been approved under the FMLA. (Doc. 16 at 100; Ex 7).[17]

28. At the conclusion of his leaves, Givaudan returned him to his former position at his pre-leave rate of pay and benefits. (Doc. 14, Ex. 3 at ¶ 3).[18]

### III. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter fo law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing, by identifying specific evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that there exists no genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the movant meets its burden, it is then the opposing party's duty to "set forth specific facts showing there is

---

[16] Plaintiff denies this statement to the extent of any inference that Defendant would not retaliate against him for the leave.

[17] Plaintiff denies this statement to the extent of any inference that Defendant would not retaliate against him for the leave.

[18] Plaintiff denies this statement to the extent of any inference that Defendant would not retaliate against him for the leave.

a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(a).

The requirement that the dispute be "genuine" is emphasized. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252. Furthermore, the non-moving party may not merely rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). A court's obligation at the summary judgment stage is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. ANALYSIS

A.  **Disability Discrimination (Counts I and II)**[19]

The ADA[20] provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of disability discrimination based upon indirect evidence of discriminatory motive, a plaintiff must show: (1) he is an individual with a disability; (2) he is "otherwise qualified" for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) after termination, the position remained open, or the employee was replaced by a non-disabled employee.[21] *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1999). Here, the fourth element, whether the employer knew or had reason to know about plaintiff's disability, is the only issue in dispute.

---

[19] Federal and state disability discrimination claims are subject to the same evidentiary standards and may be evaluated concurrently. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).

[20] Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

[21] It may not be necessary to show that the replacement employee is not disabled. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186, n. 11 (6th Cir. 1996). "[D]isabilities are diverse," and "replacement of one disabled individual with another disabled individual does not necessarily weaken the inference of discrimination against the former individual that arises through establishment of the five [elements of the *prima facie* case]." This last element will vary, depending on the precise facts of the case before the court. *Id.*

Defendant claims that it is entitled to judgment as a matter of law because Mr. Dabney, the sole decision-maker, was unaware of Plaintiff's disability when he made the decision to terminate him.

Plaintiff contends that he spoke with Mr. Dabney several times in late March and early April 2009, after he was diagnosed with multiple sclerosis. He told Mr. Dabney on March 20, 2009 that he was sick and would be out for several days. (Doc. 16, Ex. 3 at JN299). Mr. Dabney advised Plaintiff to get in touch with HR and "get signed up with" Matrix, the company which processed requests from Givaudan employees for short-term disability. (Doc. 17 at 119-120; Doc. 16, Ex. 3 at JN299). On April 1, 2009, Plaintiff told Mr. Dabney that he was still sick, that he had a follow-up doctor appointment on Thursday of that week for a second MRI, and that he had been coordinating with HR and Matrix. (Doc. 16, Ex. 3 at JN299). Plaintiff called Mr. Dabney two days later to report that he was still sick. (*Id.*) He spoke with Mr. Dabney a final time on April 14, 2009, to tell him that he had two more doctor appointments but would be able to return to work on April 17, 2009, after meeting with the Givaudan doctor. (*Id.*)

However, there is no evidence that Mr. Dabney knew or could have known that Plaintiff had multiple sclerosis. In fact, Mr. Dabney maintains that he had no knowledge of Plaintiff's disability when he made the decision to terminate Plaintiff. (Doc. 14, Ex. 2 at ¶ 11). Moreover, Plaintiff admits that his symptoms were invisible and that he did not require any accommodation. (Doc. 16 at 44, 58). Mr. Spencer, Defendant's HR manager was the only employee who knew that Plaintiff had multiple sclerosis. (Doc. 16 at 53-54,

58).  Mr. Spencer did not tell anyone at Givaudan about Plaintiff's MS.  (Doc. 17 at 52).  Moreover, Mr. Spencer did not play any role in the decision to terminate Plaintiff's employment.  (Doc. 14, Ex. 2 at ¶ 9; Doc. 17 at 108-09, 113).  *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996) (affirming summary judgment to employer on disability discrimination claims where there was not evidence that the four decision makers had any knowledge of plaintiff's disability).

Plaintiff cites two cases to support his argument that this Court has accepted much less compelling evidence to find a jury question about a decision maker's knowledge of protected activity.  *Erpenbeck v. Premier Gold Mgmt.*, C-1-05-419, 2006 U.S. Dist. LEXIS 85271, at *1, 6 (S.D. Ohio Nov. 22, 2006) (In an age discrimination case, plaintiff presented two facts: (1) that the decision maker had met him; and (2) that defendant had access to a form containing his birthdate.  Based on this evidence, the Court held that a jury could infer that defendant knew that plaintiff was in the protected age class.); *Wind v. Walgreen Co.*, Case No. 1:10-cv-94, (S.D. Ohio June 22, 2011) (Mr. Orvis, who made the final decision to terminate plaintiff, discussed the fact that plaintiff was out on leave for surgery with Mr. Pavel when Mr. Orvis took over Mr. Pavel's job – "Pavel clearly expressed his displeasure with Wind's use of leave and the injury from which it resulted" noting that such displeasure should be imputed to Mr. Orvis.).  However, the Court finds that these cases are distinguishable from the instant case.  In *Erpenbeck*, the decision maker saw plaintiff and could infer his age.  Conversely, in the instant case, Plaintiff's disability was invisible.  In *Wind*, there was at least some evidence to suggest a retaliatory

motive.  Additionally, defendant terminated plaintiff less than three months after he returned from FMLA leave – so evidence of proximity existed.  *Id.* at 16.

Here, the Human Resource Department's knowledge of any protected activity cannot be transferred to the decisionmaker on the limited showing Plaintiff offers.  Moreover, to expect Mr. Dabney to be on notice that Plaintiff suffered from a covered disability because Plaintiff took several weeks leave due to "sickness" is unreasonable.

Accordingly, this Court finds that Plaintiff has failed to make a *prima facie* case of disability discrimination.

### B. FMLA Retaliation (Count V)

To establish a *prima facie* retaliation claim, Plaintiff must show: (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.  *Donald v. Sybra. Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

Plaintiff argues that Defendant terminated him in retaliation for taking FMLA leave.  Defendant maintains that there is no evidence of retaliation and/or Plaintiff cannot establish a causal connection between his FMLA leave and termination.  Accordingly, the third and forth prongs of the *prima facie* case are at issue.

### 1. Whether Defendant was aware that Plaintiff's absences were FMLA qualified

Plaintiff's argument seems to suggest that once an employee tells an employer that he has a serious health condition, the employer is on notice that any subsequent leave is for that condition and therefore FMLA-qualifying. Here, the Court acknowledges that Mr. Dabney advised Plaintiff to get in touch with HR and "get signed up with" Matrix, the company which processed requests from Givaudan employees for short-term disability. (Doc. 17 at 119-120; Doc. 16, Ex. 3 at JN299). Although the link is attenuated, the evidence is recognized.

Accordingly, considering the evidence in the light most favorable to the nonmoving party, the Court finds that Mr. Dabney knew that Plaintiff's absences were FMLA qualified.[22]

### 2. Causal connection

"To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co.*, 348 F.3d

---

[22] Simply because Mr. Dabney knew that Plaintiff took FMLA leave, a finding that is attenuated, does not establish that Mr. Dabney knew that Plaintiff was disabled. The term "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13).

537, 543 (6th Cir. 2003). "Although temporal proximity alone will not support an inference in the face of compelling evidence to the contrary, the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002). There also must be "other indicia of retaliatory conduct . . . to support a finding of a causal connection." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

The record reflects that in 2008, Mr. Dabney talked to Plaintiff about his performance problems and that Kay Whitener cited Plaintiff as her primary reason for resigning. (Doc. 14, Ex. 2 at ¶ 4). On September 5, 2008, Deb Navarro in human resources sent Mr. Dabney an e-mail with Ms. Whitener's exit interview that stated "I do suggest a plan of action with regard to Joe [Nilles] before other people exit the company, or the perception of your department suffers more." (*Id.*) Thereafter, Mr. Dabney and Ms. Navarro discussed a plan to terminate Plaintiff for his poor performance. (*Id.* at ¶ 5). They maintain that they did not terminate Plaintiff at that time because they needed time to figure out who would manage purchasing of both Devon and Carthage facilities and they had to fill Ms. Whitener's position, which was not filled until May 2009. (*Id.*) Then, in July 2009, another employee resigned, citing difficulties with Plaintiff. (*Id.* at ¶ 7). Subsequently, Mr. Dabney terminated Plaintiff and retained Ms. Fulmer to manage purchasing for Devon and Carthage. (Doc. 16 at 59-65; Doc. 14, Ex. 2 at ¶¶ 3-10, Ex. E).

Therefore, the evidence indicates that Defendant intended to terminate Plaintiff before he ever took his April 2009 FMLA leave. *See also Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) (finding plaintiff did not establish a *prima facie* case of retaliation and affirming summary judgment; "the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of the events").

Plaintiff claims that a jury could reject the August 5, 2009 email to Mr. Spencer and others as establishing when, or even if, Mr. Dabney made this action plan. Plaintiff argues that a jury could consider this email an example of a decision maker's attempt to manufacture support for a termination decision and determine that it is evidence of pretext. Specifically, a jury could decide that there was never any decision to terminate in September 2008 and that it was created out of whole cloth to cover a discriminatory or retaliatory decision made after the revelation of Plaintiff's multiple sclerosis. *See, e.g., Dage v. Time Warner Cable*, 395 F.Supp.2d 668, 677 (S.D. Ohio 2005) (where this Court took note of the timing of the written discipline the defendant issued to the plaintiff after he took FMLA leaves, finding that this bolstered his claims of a causal connection and that a jury could infer that the defendant attempted to "paper" the plaintiff's file in anticipation of his termination). Here, however, the Court finds that there is absolutely no evidence of fabrication. In fact, the 2008 plan Mr. Dabney refers to in the email coincides with Ms. Navarro's email in September 2008 stating that they needed a plan for terminating Plaintiff.

Moreover, even if there were not evidence that Defendant intended to terminate Plaintiff before his FLMA leave, any temporal connection between his use of FMLA leave and the decision to terminate him is tenuous at best. Plaintiff requested FMLA leave from December 2007-January 2008 and March and April of 2009 (returning April 17, 2009). (Doc. 16 at 94, 100, 102; Ex. 7; Doc. 14, Ex. 3 at ¶ 3). Plaintiff was terminated on October 20, 2009. (Doc. 16 at 66-67). Accordingly, Plaintiff was terminated over six months after his last FMLA leave. Here, this is insufficient to establish temporal proximity. *See, e.g., Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that the plaintiff established a causal connection when termination occurred within three months of protected conduct). *Compare with Anderson v. Avon Prod., Inc.*, 340 Fed. Appx. 284, 288 (6th Cir. 2009) (no causal connection where six months separated the plaintiff's use of FMLA leave and the adverse employment action).[23]

Accordingly, Plaintiff fails to establish temporal proximity or other indicia of retaliatory conduct to make a *prima facie* case of FMLA retaliation.

---

[23] Additionally, Plaintiff speculates that his employment was terminated because Defendant was concerned about the "future possibilities" of Plaintiff needing more FMLA leave. (Doc. 16 at 96-97). Such speculation is insufficient to support a FMLA claim as a matter of law. *See, e.g., Laws v. HeathSouth N. Ky. Rehab. Hosp. Ltd.*, No. 2009-220, 2011 U.S. Dist. LEXIS 127195, at *74-75 (E.D. Ky. Nov. 1, 2011) (summary judgment to employer on FMLA claim; rejecting plaintiff's argument that her employer "anticipated" that she would take more FMLA leave in the future and terminated her to prevent her from taking more FMLA leave). In fact, in the instant case, the Defendant presents evidence that, since 2006, over 100 employees at the Carthage plant have taken FMLA leave (sometimes repeatedly) and remain employed with the Company. (Doc. 14, Ex. 3 at ¶ 4).

### C. Gender Discrimination (Counts III and IV)[24]

The Sixth Circuit has modified the *prima facie* case for instances where, as here, a Title VII plaintiff claims reverse discrimination as a member of a demographic majority.[25] *Treadwell v. Am. Airlines, Inc.*, No. 10-5809, 2011 U.S. App. LEXIS 23348, at *4 (6th Cir. Nov. 18, 2011). To establish a *prima facie* case of reverse gender discrimination, a plaintiff must show: (1) background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority; (2) evidence that similarly situated employees were treated differently. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002). The plaintiff can meet this burden by showing that the defendant relied on unlawful consideration of protected characteristics in the past. *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

Plaintiff fails to present any evidence which supports a suspicion that Defendant is the rare employer who discriminates against the majority. Accordingly, Plaintiff has failed to satisfy his *prima facie* case for gender discrimination.

### V. CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment (Doc. 14) is **GRANTED**, and this case is **CLOSED**.

---

[24] A claim for gender discrimination under both Ohio and federal law is analyzed under the same framework. *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620 (6th Cir. 2010).

[25] Plaintiff is a male and therefore is not a member of any category protected by Title VII. *See* 42 U.S.C. § 2000e-2(a)(1).

**IT IS SO ORDERED.**

Date: May 1, 2012    *s/ Timothy S. Black*
Timothy S. Black
United States District Judge